Paul D. MOLINEAUX, et al., Plaintiffs,

v.

UNITED STATES, et al., Defendants.

Civ. A. No. 91–1634.

United States District Court,
District of Columbia.

April 2, 1992.

Bridget Read Mugane, Washington, D.C., for plaintiffs.

Diane Marie Sullivan, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

Plaintiffs are 26 former class 1 Foreign Service Officers ("FS-1s") who were obliged to leave the Foreign Service after they were not promoted into the Senior Foreign Service ("SFS"). They challenge a decision of the Foreign Service Grievance Board upholding the personnel system developed by the Foreign Service in response to a congressional directive that the Service assure a proper flow of officers up the ranks of the Foreign Service. *See* Foreign Service Act of 1980, § 601(c)(2), 22 U.S.C. § 4001. The issues are before the Court on cross motion to affirm or reverse the decision of the Foreign Service Grievance Board and defendants' alternative motion to dismiss. The matter has been fully briefed by both parties and argued.

### I. Background

The Foreign Service operates under what is generally called an "up-or-out" personnel system. If an officer is not promoted within a certain number of years, he may be required to leave the Service. Of course, the only opportunity that an officer has to receive a promotion is if there is a need for more officers in the higher ranks. If there are not enough slots, even qualified officers may have to be terminated.

In order to encourage the Foreign Service to develop a means for assuring a steady flow upward of the best qualified younger officers, Congress enacted section 601 of the Foreign Service Act of 1980. Section 601(c)(2) provides:

Decisions by the Secretary on the numbers of individuals to be promoted into and retained in the Senior Foreign Service shall be based upon a systematic long-term projection of personnel flows and needs designed to provide—

(A) a regular, predictable flow of recruitment in the Service;

(B) effective career development patterns to meet the needs of the Service; and

(C) a regular, predictable flow of talent upward through the ranks and into the Senior Foreign Service.

22 U.S.C. § 4001(c)(2).

Subsequent to enactment of this 1980 statute, the Foreign Service developed a personnel model that set a fixed attrition rate among senior officers of 10 percent. To maintain that rate, the Service would adjust the number of Limited Career Extensions ("LCEs") it granted. LCEs allow an officer to spend additional time in his class without being forced out for lack of promotion.

By written announcement dated May 1, 1981, the Director General invited FS-1 officers to apply for earlier promotion into the SFS by "opening their windows." The announcement stated that the Foreign Service "would be guided by" the need for regular flow in its promotions process, but advised that by "opening their windows" in this fashion, officers who accepted the invitation would be terminated in six years if they had not been promoted by then, whether or not they might still have had additional time left in their class if they had not made themselves available for early promotion. A number of FS-1s accepted the invitation and opened their windows.

Because of various external factors during the 1980s, including a shrinking number of total SFS positions and a lower-than-expected voluntary attrition rate among senior officers, the personnel model developed by the Service actually led to diminishing numbers of promotions into the SFS during the mid–1980s—from 69 in 1981 to a low of 39 in 1984. Thereafter, the promotions again began steadily to rise. However, since many officers, including the plaintiffs, happened to open their windows in the early 1980s, their eligibility for promotion coincided with the downturn in promotions during the mid–1980s. As a result, fewer FS-1s in those classes were promoted than had been expected. Plaintiffs contend that they were misled by the invitation into opening their windows at a bad time and that the overall personnel model developed by the Service failed to comply with the statutory requirements of

section 601 of the Act in that a higher flow was not immediately achieved.

## II. The Merits

### A. *The Invitation*

As a preliminary matter, plaintiffs' contentions regarding the invitation must be subordinated to the general discussion of the personnel model as a whole. The invitation simply gave officers the option of opening their windows and provided necessary background. In particular, the materials attached to the invitation referred to section 601(c) and said that the Service would be "guided by the need to maintain a regular, predictable flow of promotions"— language that tracks the statute almost verbatim. The attached materials presented the success rate of candidates in previous years, but warned that "statistical averages and historical experience may have limited relevance...." Attachment to Letter from John M. Clark, May 14, 1991, Pl.App. at 194. As the materials stated, the purpose of the invitation was to help officers "determine whether they are eligible for promotion into the SFS and, if so, whether to request consideration for promotion by the Senior Threshold Selection Board (STB) at this time." *Id.* at 192. No promises were made and none of the information was false or misrepresentative. On the contrary, the Service was providing prospective applicants with all available information necessary to make an informed choice, while at the same time indicating that opening the window inevitably had uncertain results. In the years following the invitation, a number of applicants were in fact promoted.

### B. *The Personnel Model*

Plaintiffs request the Court to declare the Service's flow program invalid and to remand the cases of the individual plaintiffs for further consideration by the Board. Such further consideration, if ordered, would of necessity require that the Board first establish a new flow standard consistent with directions interpreting the Act that would have to be given by the Court to explain what type of personnel system would comply with the statute's provisions.[1] Obviously, it is not the function of the Court to devise a flow scheme for the Foreign Service out of whole cloth. Support for the Court's decision would have to appear from the face of the statute.

Examination of the statute, however, reveals that while Congress clearly expressed a desire to improve upward mobility of younger foreign service officers, Congress failed to set a numerical rate or other identifiable standard that the Service is required to meet in developing its personnel system. Given a good faith attempt on the part of the Service to comply with the statute, the means, as well as the details of the ultimate ends, are left entirely to the Secretary's discretion. The very nature of the Foreign Service, and in particular, the Secretary's need for flexibility, precludes a rigid formula. Moreover, many factors beyond the control of the Secretary affect the rate of flow, including uncertainties in world events, the general state of the economy and the resulting availability of alternative employment opportunities for top senior officers, the unpredictability of the rate of resignations of senior officers, and budgetary restraints. Accordingly, the Service must exercise discretion in order to reconcile the objectives broadly outlined in the relevant personnel legislation with the President's foreign policy requirements.

The Court could intervene to correct the Secretary's actions in these matters if it appeared that the Service had not made a conscientious effort to comply with the statute. Indeed, the plaintiffs argue that the Service did not go far enough in its efforts to comply. They contend that the statute put a premium on upward flow throughout the ranks of the Service and that congestion at the top was one of the primary problems that the Service was directed to address. By the plain language of the statute, however, Congress required

---

1. The Board would need to determine what a complying personnel model would have looked like in order to be able to determine which of the individual plaintiffs should have been promoted and which, therefore, are entitled to relief.

only that the Service's personnel system be "designed" to provide a regular flow, not that it accomplish that goal at any cost and at all times. In the same section, for example, Congress indicated that career patterns must be accommodated to "meet the needs of the Service." 22 U.S.C. § 4001(c)(2)(B).

The record establishes that the Service made a thorough and informed effort to address the flow problem in light of its overall mission, and in fact, a number of promotions were made of junior officers who took advantage of the opportunity to open their windows. With only the vague personnel statute as a guide, the Court is in no position to question the details of the system developed by the Service. Having made the determination that flow was an issue that the Service's personnel system was designed to address, the Court must defer to the Service's conclusions as to what the specifics of the system should be.

The statute specifically provides that the Secretary of State shall make a yearly report to Congress on the effectiveness of the steps taken to provide for flow; and he has done so without disapproval. *See* 22 U.S.C. § 4001(c)(4)(B). Aside from the reporting requirement, Congress was content to prescribe only general goals in relation to Foreign Service personnel matters. Congress clearly did not want to hinder the Secretary's ability to structure the Foreign Service to address the foreign policy needs as he understood them to be. The reporting requirement gives Congress the information it needs to take further action if necessary. Moreover, the structure of the statute evidences an obvious intent to give Congress primary responsibility for oversight, not the courts. Under such circumstances, the Court can find no aspect of the system developed that violates the statute, nor any basis to overturn the Secretary's actions.[2]

An appropriate Order accompanies this Memorandum.

2. The Foreign Service Grievance Board thoroughly reviewed all the issues raised by plaintiffs. In a detailed and very complete report, the Board reached essentially the same conclusions as the Court. The Court can find nothing improper or inadequate in the Board's decision either procedurally or substantively.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby

ORDERED that defendants' Motion to Dismiss, or in the Alternative, to Affirm the Decision of the Foreign Service Grievance Board is granted; and it is further

ORDERED that plaintiff's petition for review is denied; and it is further

ORDERED that the complaint is dismissed with prejudice.